UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ISADORE LAMARR HALL,
also known as Robert Charles Hall,

                    Petitioner,                    Case No. 1:05-cv-142

v.                                                 Honorable Wendell A. Miles

KENNETH McKEE,

                    Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254. Petitioner Isadore Lamarr Hall (also known as Robert Charles Hall) is serving a term of

twenty to forty years, imposed by the Macomb County Circuit Court on March 18, 2002, after a jury

convicted Petitioner of possession with intent to deliver 650 grams or more of cocaine, MICH. COMP.

LAWS § 333.7401(2)(a)(i),[1] and resisting and obstructing a police officer, MICH. COMP. LAWS

§ 750.479b. In his *pro se* petition, Petitioner raises ten grounds for relief, as follows:

I.    WHETHER PETITIONER'S CONSTITUTIONAL RIGHT TO A FAIR
      TRIAL AND HIS CONSTITUTIONAL RIGHT TO CONFRONT HIS
      ACCUSERS WERE VIOLATED WHEN THE TRIAL COURT ALLOWED
      INTO EVIDENCE THE CI'S STATEMENTS THAT THE PETITIONER
      WAS PUFF, THE DETAILS OF THE ALLEGED BUY, AND
      STATEMENTS OF A RESIDENT OF THE HOME INVOLVED, ALL OF
      WHICH WERE HEARSAY USED AS SUBSTANTIVE EVIDENCE TO
      SUPPORT PETITIONER'S GUILT FOR THE CRIMES CHARGED,

---

[1] In the time since Petitioner's conviction under this provision, the Michigan Legislature amended it to require possession with intent to deliver more than 1,000 grams of controlled substance. *See* MICH. COMP. LAWS § 333.7401(2)(a)(i).

THUS, VIOLATIVE OF HIS FIFTH, SIXTH AND FOURTEENTH AMENDMENTS CONSTITUTIONAL RIGHTS?

II.   WHETHER PETITIONER'S CONSTITUTIONAL RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN HE WAS SENTENCED TO THREE CONSECUTIVE TERMS OF IMPRISONMENT FOR THE TWO POSSESSION OF COCAINE CONVICTIONS FOLLOWING A MISDEMEANOR CONVICTION FOR RESISTING A POLICE OFFICER?

III.   WHETHER THE STATE PROSECUTOR'S ACTIONS IN THIS CASE VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW

IV.   WHETHER THE EVIDENCE PRESENTED BY THE MACOMB COUNTY PROSECUTOR TO A MACOMB COUNTY DISTRICT COURT JUDGE, CIRCUIT COURT JUDGE AND JURY WITHIN THE STATE OF MICHIGAN WAS CONSTITUTIONAL [sic] SUFFICIENT TO CONFER JURISDICTION WITHIN THE COUNTY OF MACOMB AND TO SUBMIT THE CONSPIRACY CHARGE TO THE MACOMB COUNTY JURY TO CONVICT, WHICH UNDER THE CIRCUMSTANCES REQUIRES A NEW TRIAL ON THE OTHER CHARGES WITHIN THE PROPER COUNTY.  THUS, VIOLATIVE OF PETITIONER'S SIXTH AMENDMENT CONSTITUTIONAL RIGHTS TO BE TRIED BY AN IMPARTIAL JURY WITHIN THE COUNTY IN WHICH THE CRIME WAS COMMITTED?

V.   WHETHER THE MACOMB COUNTY PROSECUTOR WITHIN THE STATE OF MICHIGAN PRESENTED SUFFICIENT EVIDENCE TO CONVICT PETITIONER OF POSSESSION OF THE COCAINE FOUND AT 5969 CADILLAC IN DETROIT MICHIGAN WITHIN THE COUNTY OF WA[YN]E.   THUS, VIOLATIVE OF PETITIONER'S CONSTITUTIONAL RIGHTS TO BE TRIED BY A JURY WITHIN THE COUNTY WHERE THE CRIME WAS COMMITTED?

VI.   WHETHER THE MACOMB COUNTY PROSECUTOR WITHIN THE STATE OF MICHIGAN PRESENTED CONSTITUTIONAL [sic] SUFFICIENT EVIDENCE TO SUPPORT PETITIONER'S CONVICTION FOR RESISTING AND OBSTRUCTING A POLICE COMMITTED IN DETROIT MICHIGAN WITHIN THE COUNTY OF WAYNE. THUS, VIOLATIVE OF PETITIONER'S SIXTH AMENDMENT CONSTITUTIONAL RIGHTS TO BE TRIED BY AN IMPARTIAL JURY WITHIN THE COUNTY WHERE THE CRIME WAS COMMITTED?

    VII.    WHETHER THE EVIDENCE PRESENTED BY THE MACOMB COUNTY PROSECUTOR WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE, AND, THUS, VIOLATIVE OF PETITIONER'S CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW?

    VIII.    WHETHER PETITIONER'S CONSTITUTIONAL [RIGHTS] WERE VIOLATED WHEN THE TRIAL COURT COMMITTED REVERSIBALE [sic] ERROR ON A NUMBER OF RULINGS WHICH VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW. THUS, VIOLATIVE OF HIS FIFTH, SIXTH AND FOURTEENTH AMENDMENT CONSTITUTIONAL RIGHTS?

    IX.    WHETHER PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW WHEN THE TRIAL COURT DENIED HIS MOTION FOR A NEW TRIAL?

    X.    WHETHER PETITIONER'S TRIAL ATTORNEY RENDERED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED TO OBJECT TO NUMBEROUS [sic] QUESTIONS REGARDING THE USE OF THE PROSECUTOR'S EVIDENCE THAT WAS VERY PREJUDICIAL TO THE PETITIONER AND DEPRIVED PETITIONER OF A FAIR TRIAL AND DUE PROCESS OF LAW AND, THUS, VIOLATIVE OF PETITIONER'S FIFTH, SIXTH AND FOURTEENTH AMENDMENT CONSTITUTIONAL RIGHTS?

Respondent has filed an answer to the petition (docket #44) arguing that the grounds should be denied because they are either procedurally defaulted or without merit. Upon review and applying the AEDPA standards, I find that the claims are either without merit or non-cognizable. Accordingly, I recommend that the petition be denied.

**Procedural History**

**A.  Trial Court Proceedings**

    The state prosecution arose from an investigation conducted by the Macomb County Drug Enforcement Task Force (COMET) into cocaine trafficking between Wayne and Macomb Counties. Petitioner was arrested outside a Detroit residence that was being searched after a

confidential informant had been observed conducting a series of drug transactions at the residence. Petitioner was charged with conspiracy to deliver and manufacture cocaine 50 to 224 grams; delivering or manufacturing 650 or more grams of cocaine; and resisting and obstructing an officer. Petitioner was tried before a jury over the course of eleven days, beginning on January 15, 2002, and concluding on February 1, 2002.

On the first day of trial, Petitioner presented a motion in limine.  (Trial Tr. vol. I, 3, docket #25.)[2]  The parties had stipulated to certain aspects of the motion, but disagreed on whether police officers would be able to testify regarding statements made by a woman present in the house in which the cocaine was found to the effect that Petitioner was known as "Puff."  (Tr. I, 4.) Petitioner argued the statement was inadmissible hearsay; the prosecution argued the statement was not hearsay.  (Tr. I, 6-9.)  The court ruled that the credibility of the statement was for the jury to decide.  (Tr. I, 9.)

Michigan State Police Trooper Shannon Sims testified as follows.  In January 2001, Sims worked as an undercover COMET detective investigating illegal narcotics trafficking in Macomb County.  (Tr. II, 37.)  In December 2000, after receiving information from a confidential informant, Sims began investigating a man named "Puff."  (Tr. II, 38-39, 40.)  The informant described Puff as a black male, about 5'10", 250-260 pounds, short and stocky, with "Chinese eyes," who drove a late-model tan Cadillac, and whose telephone number was (313) 516-0110.  (Tr. II, 40-41.)  While conducting "drive-bys" on the residence at 5969 Cadillac, Sims observed the tan Cadillac he believed was the same one the informant had referenced.  (Tr. II, 40-41, 42.)  In January

_____

[2]For the remainder of this opinion, the Court will refer to each volume of the proceedings, corresponding to one day of trial record, by the designation of "Tr. [volume #], [page ##]."  Volumes I through XI of the trial transcript are, in chronological order, docket ## 25-35, respectively.

2001, Sims, along with Detectives Taylor and Berger, asked the informant to do a controlled purchase of one ounce of cocaine from Puff at 5969 Cadillac in Detroit.  (Tr. II, 39, 42-43.)  On January 10, 2001, Sims dialed (313) 516-0110 and gave the phone to the informant, who spoke to someone on the other end for about two to three minutes.  (Tr. II, 44-45, 46.)  Sims believed the person on the other end of the line was Petitioner.  (Tr. II, 224-25.)  Sims searched the informant's person and car and found no money or drugs.  Taylor then gave the informant State Police "buy funds," which had been pre-recorded and photocopied.  (Tr. II, 45-46.)  Sims observed the informant as he drove to 5969 Cadillac.  (Tr. II, 46-48.)  The informant parked, walked to the front door of 5969 Cadillac, and walked in.  (Tr. II, 48, 52.)  The tan Cadillac was parked in the area of 5969 Cadillac.  (Tr. II, 48.)  At trial, Sims identified as accurate photographs of the house at 5969 Cadillac and of the house at 5969 Cadillac with the tan Cadillac parked in front; the court admitted all three photos into evidence.  (Tr. II, 48-52.)  Sims parked on the side of the street and watched the house until the informant exited five to ten minutes later and got into his car.  (Tr. II, 52-53.)  Sims performed surveillance on the informant as he drove his car to the designated meeting place; Sims, Berger, and Taylor then met with the informant, who handed Sims what appeared to be powder cocaine in a clear plastic baggie.  (Tr. II, 53-55.)  The informant told Sims about the transaction; Sims then searched the informant, and told him he would contact him later.  (Tr. II, 65-66.)

Sims testified that he field-tested the powder as positive for cocaine, weighed it at 29.2 grams (which is just over one ounce), then sent it to a State Police lab for further analysis. (Tr. II, 55-56.)  In Sims' experience, one-half gram to one gram of powder cocaine would indicate it was intended for personal use; greater amounts would indicate it was for other purposes, such as distribution.  (Tr. II, 57.)  The cocaine obtained by the informant was "chunky," which indicated it

might have been chipped away from a larger block of cocaine.  (Tr. II, 58-59.)  On the stand, over Petitioner's objections, Sims opened, poured, and divided into four lines a one-ounce package of artificial sweetener.  (Tr. II, 59-64.)  Sims then testified that amount – one ounce – of powder cocaine would not be for personal use, but would be intended for distribution to others.  (Tr. II, 64, 178-79.)

Sims testified that he met with the informant again on January 16, 2001, to conduct another controlled buy at 5969 Cadillac.  (Tr. II, 66.)  The confidential informant advised Sims that he had been contacted by two men, Brian Weaver and Richard Hagerman, who wanted to obtain two ounces of cocaine.  Sims' planned that the informant would meet with Weaver and Hagerman at a McDonald's, where they would give the informant money to buy cocaine.  The confidential informant would then go to 5969 Cadillac to purchase the two ounces from "Puff."  After obtaining the cocaine, the confidential informant would transport the cocaine back to Weaver and Hagerman, who were known narcotic traffickers in Macomb County.  Sims and his team of officers would conduct surveillance and would then try to arrest Weaver and Hagerman.  (Tr. II, 67-69, 71.)  The confidential informant drove to 5969 Cadillac, went into the house, came out a few minutes later, and drove to McDonald's.  Weaver got into the informant's car for a few minutes.  (Tr. II, 69-77.)  After Weaver got out of the informant's car, he got back into his truck and drove northbound on Interstate 94; Sims and his team of officers followed.  (Tr. II, 78-79.)  Weaver was arrested and officers handed Sims two ounces of cocaine they said they had found on Weaver's person.  (Tr. II, 81.)  Sims' field test indicated the substance was cocaine; he then sent it to a State Police crime lab for further processing.  (Tr. II, 82.)  Sims followed Berger and the informant back to 5969 Cadillac, where the informant gave Puff the money he had received from Weaver and Hagerman.  (Tr. II, 83-

85.)  The tan Cadillac was at 5969 Cadillac both times Sims followed the informant to that address on January 16.  (Tr. II, 77, 84.)

Sims further testified that, along with about 20 other officers and a narcotic-sniffing dog, he executed a search warrant at 5969 Cadillac on January 17, 2001.  (Tr. II, 86-87.)  Prior to the search, Sims and his officers confirmed that the tan Cadillac was in fact at the residence via surveillance and having the informant call Puff on the telephone three times at (313) 516-0110.  (Tr. II, 88-97.)  Sims sat with the informant in Sims' car as officers searched the residence and arrested Puff.  (Tr. II, 97.)  Sims then went to the house and observed Isadore Hall, who Sims identified at trial as Petitioner, handcuffed and in custody, and the tan Cadillac nearby.  (Tr. II, 98, 100, 230, 233.)  Police had also arrested a man named Fitzgerald, who was in the front passenger seat in Petitioner's car.  (Tr. II, 214.)[3]  Sims entered the house and observed a black female he believed to be named Tamika Bernett, who had also been placed in custody by officers searching the house.  (Tr. II, 98, 103-04.)  Sims observed the searching officers find and seize narcotics and other items and list them on an inventory before Sims took the items to the COMET office.  (Tr. II, 101-03, 192.)

At trial, Sims identified several items the searching officers seized at 5969 Cadillac, including a clear sandwich baggie containing eight smaller clear plastic bags of crack cocaine weighing about 70 grams; a clear freezer bag with five clear plastic bags containing a white powder substance of suspected cocaine weighing about 552 grams; one clear ziplock bag  containing three clear plastic bags, each of which contained an off-white substance suspected to be crack cocaine weighing about 337 grams; a clear bag with an off-white substance suspected to be crack cocaine weighing about 6.2 grams; two digital scales with cocaine residue on their tops; unused clear plastic

---

[3]Sims was uncertain, but did not believe Mr. Fitzgerald was charged with possession of the cocaine found at 5969 Cadillac.  (Tr. II, 215.)

bags, in which cocaine is normally sold; four clear plastic bags with cocaine residue on them; a clear plastic bag of suspected marijuana weighing about six grams; a razor knife, which may have been used to cut cocaine for sale, with cocaine residue on the tip; a silver spoon with cocaine residue on it; two pieces of documentation establishing the residency of Tamika Burnett at 5969 Cadillac; two cell phones, one of which officers confirmed had the number (313) 516-0110; a pager; one box of baking soda, which is used in producing crack cocaine; a social security card bearing a social security number and the name Robert Charles Hall; a Michigan identification card also bearing the name and a photo of Robert Charles Hall; a black wallet; a kilo wrapper; a glass jar with cocaine residue on it; a measuring cup with cocaine residue on it; two one hundred dollar bills; $1,038 in various denominations. (Tr. II, 104-24, 226.) Sims placed each of the items found at 5969 Cadillac in Michigan State Police heat-sealed bags before they were taken to the Sterling Heights police laboratory for analysis. (Tr. II, 108-09, 111, 113.) During their search, officers also seized from Puff's person nine pieces of U.S. currency of various denominations that matched the pre-recorded serial numbers of bills given to the informant by Hagerman and Weaver in the undercover buy. (Tr. II, 124-27.) Sims believed that crack cocaine was being manufactured inside 5969 Cadillac; and that the cocaine found there was jointly owned by Petitioner and Tamika Burnett. (Tr. II, 177, 205-06.) A warrant was issued for Tamika Burnett's arrest shortly before Petitioner's trial began. (Tr. II, 203-04, 210.) Sims further believed that, although the cocaine was seized at 5969 Cadillac in Detroit, Petitioner was "supplying," or selling, cocaine in Macomb County. (Tr. III, 32-33, 49-50.)

On cross-examination, Sims testified that he had no information that Petitioner or anyone named "Puff" was selling drugs, other than that he received from the informant. (Tr. II, 131-

32, 201, 240.)  Nor had Sims had any prior dealings with – and, thus, no opportunity to judge the reliability of – the confidential informant used in this case until this particular investigation.  (Tr. II, 133-37, 183-84.)  The informant with whom Sims worked in this case had a pending criminal charge, and, therefore, had a self-serving motive to work with the COMET officers.  (Tr. II, 144.)  Sims admitted that Petitioner was not inside the house at 5969 Cadillac on the day of the arrest, but instead was arrested while in his car, which was parked one house away.  (Tr. II, 100, 189, 197.)  Only Tamika Bernett was inside the premises at the time of the search.  (Tr. II, 189-90.)  Sims eventually came to know that Hagerman and Weaver schemed to "set up" or frame others in drug arrests; but denied that Hagerman, Weaver, or the confidential informant framed Petitioner in this case.  (Tr. II, 148-49; Trial Tr. III, 1/17/02, 21-22, docket #27.)  Sims admitted that he could not see inside the house, and, thus, could not see whether Petitioner gave the informant the drugs, or whether Petitioner was even in the house, during the controlled buys by the informant.  (Tr. II, 155-58, 181.)  There was no evidence that Petitioner lived at 5969 Cadillac, or that Petitioner was ever in possession of the cocaine seized therefrom.  (Tr. II, 188-89, 195; Trial Tr. III, 1/17/02, 53-54, 57, docket #27.)  Sims admitted that he was not aware whether Petitioner might have been doing some painting at 5969 Cadillac, and might have had the marked bills on his person the day of the arrest because Tamika Burnett had just paid him with those bills.  (Tr. II, 159- 61, 222.)  Sims admitted that he had not personally tested the materials taken from 5969 Cadillac to determine whether each was actually cocaine.  (Tr. II, 175-76.)  He further admitted that it was possible that an ounce of cocaine could, in fact, be intended for personal use.  He also acknowledge that the tan Cadillac he thought was Petitioner's was registered to someone named Valerie who lived on Fairport Street.  (Tr. II, 180, 184; Trial Tr. III, 1/17/02, 46-48.)  Sims did not believe that any of the readable fingerprints

found on the items seized from 5969 Cadillac matched those of Petitioner.  (Tr. II, 243-45; Tr. III, 9.)

Mount Clemens Police Department Officer and COMET member Mark Berger testified as follows.  In January 2001, Berger helped Officers Sims and Robert Taylor to investigate someone named "Puff" who, according to a confidential informant, lived on Cadillac Street in Detroit and was selling "extremely large quantities of cocaine."  (Tr. III, 80-81.)  In plain clothes, Berger assisted with the January 10, 2001 controlled buy at 5969 Cadillac Street.  (Tr. III, 81, 83.)  Berger rode with Sims in an unmarked silver Ford Taurus, and Taylor drove an unmarked bronze Jeep Cherokee.  (Tr. III, 83.)  The three met with the informant near Cadieux Street, searched him and his car, gave him $800 in prerecorded bills, and followed him to 5969 Cadillac.  (Tr. III, 82-84.)  Berger saw a beige-colored Cadillac in front of the house at 5969 Cadillac Street.  (Tr. III, 85.)  The informant walked up to the house and went in, exiting 20 minutes later.  Berger, Sims, and Taylor then followed the informant to the same "meet spot" near Cadieux Street.  (Tr. III, 84-85.)  At the meet spot, the officers searched the informant and his car, noting the prerecorded bills were no longer in his possession.  (Tr. III, 86.)  The informant then gave Sims about an ounce of cocaine, which Sims then took to the COMET office and placed in evidence.  (Tr. III, 85-86.)

Berger testified that he also assisted in the January 16, 2001 prearranged buy at 5969 Cadillac Street, in which the informant had arranged to buy two ounces of cocaine at 5969 Cadillac for two people from St. Clair Shores, Brian Weaver and Richard Hagerman.  (Tr. III, 87-88.)  Berger watched the confidential informant talk to Weaver and Hagerman on the telephone the day of the buy.  (Tr. III, 89-90.)  After the phone call, the officers followed the informant to a McDonald's in Detroit.  (Tr. III, 91.)  The informant spoke to two white males in a black pickup truck, then left again in his car.  (Tr. III, 91.)  Berger met and searched the informant, then proceeded behind the

informant to 5969 Cadillac.  (Tr. III, 91-92.)  The plan was for the informant to be "fronted" cocaine, that is, to be given cocaine to be paid for later.  (Tr. III, 92.)  Berger watched the informant go into the house at 5969 and exit about 10 minutes later; Berger then followed the informant back to McDonald's, where the informant again met with Weaver and Hagerman in the pickup truck.  (Tr. III, 92-93.)  After meeting with the two men, the informant handed Berger $1,600.  (Tr. III, 94).  Berger searched the informant and found no other currency or drugs in the informant's possession.  (Tr. III, 94.)  Berger recorded the serial numbers of each of the bills he received from the informant.  (Tr. III, 94-97.)   At trial, Berger authenticated a list of serial numbers that was admitted into evidence.  (Tr. III, 94-95, 102.)  Berger then gave the money back to the informant, and followed him back to 5969 Cadillac Street, where Berger again saw the beige Cadillac.  (Tr. III, 103.)  The informant went into the house and exited five to ten minutes later.  (Tr. III, 103.)  After Berger searched the informant and his vehicle, finding no money or drugs, the informant was released.  (Tr. III, 103-04.)

Berger further testified that on January 17, 2001, he helped prepare for the execution of a search warrant at 5969 Cadillac Street.  (Tr. III, 105.)  After receiving information from Sims, Berger went to a repair shop at Seven Mile and Hoover Streets, where he saw the same Cadillac that he had previously seen parked in front of 5969 Cadillac.  (Tr. III, 105-06, 148.)  Berger notified Taylor that he had located the vehicle and then observed it for about one hour, at which time the vehicle left the repair shop occupied by a black male.  (Tr. III, 106-07.)   The vehicle parked at the corner of Wilfred and Annsbury Streets in Detroit, where the driver exited his car and went into a house.  (Tr. III, 107.)  With binoculars, Berger observed the driver to be a stocky black male, about 5'7"; at trial Berger identified the man as Petitioner.  (Tr. III, 107-08.)  Petitioner and another black man exited the house shortly thereafter, got into the Cadillac, and drove directly to 5969 Cadillac.

(Tr. III, 108-09.)  Berger radioed other officers to take over surveillance of the Cadillac as it proceeded to 5969 Cadillac.  (Tr. III, 109, 150.)  As Berger approached 5969 Cadillac, no longer following Petitioner's car, he saw numerous undercover police cars, and therefore had to park a short distance away from the house.  (Tr. III, 109, 150.)  Berger exited his vehicle and ran toward the house.  He saw the tan Cadillac in the middle of the street in front of the house, with its doors opened.  (Tr. III, 109-10, 151.)  He saw the car's driver "Mr. Hall" laying on the ground struggling with Lieutenant Margosian as Margosian tried to handcuff him.  (Tr. III, 110-11, 112.)  Berger shouted at Petitioner to stop resisting arrest and place his hands behind his back; then grabbed one of Petitioner's arms out from underneath him.  (Tr. III, 114-16, 175.)  Petitioner eventually was handcuffed with two sets of handcuffs.  (Tr. III, 116.)  The other person in the car was arrested without incident.  (Tr. III, 116-17.)  Meanwhile, a COMET entry team entered and secured the house.  (Tr. III, 117.)

Berger testified that, once the house was secured, he entered the residence to search for narcotics, along with five or six other officers.  (Tr. III, 117-18, 130, 184.)  At trial, Berger identified two photographs taken of Berger searching and finding suspected crack cocaine in a ziplock freezer bag he found in a brown box at the top of the stairs to the second floor.  (Tr. III, 119-121, 129, 131.)  Berger identified the bag of crack cocaine he had found.  (Tr. III, 122.)  The cocaine was turned over to Officer Dowell, who was filling out the "return and tabulation" for the search.  (Tr. III, 122-23.)  Berger further testified that his search of the kitchen yielded a glass Pyrex measuring cup caked with suspected crack cocaine residue; pans; a silver spoon; and a set of keys.  (Tr. III, 124-26.)  Berger had observed Officer Guisdile place one of the keys in the front door of the residence at 5969 Cadillac and unlock the door.  (Tr. III, 126-27, 195-97.)  Berger later came to know that Guisdile found the keys in Petitioner's pocket.  (Tr. III, 195-96.)  Berger did not search

- 12 -

any areas other than the top of the stairs and the kitchen.  (Tr. III, 185.)  He was later advised that other officers had found drugs in the attic.  (Tr. III, 207.)

Berger testified that Petitioner was not the registered owner of the tan Cadillac, as it was registered to a Valerie Love Hall at 19916 Fairport Street in Detroit.  (Tr. III, 138.)  Tamika Bernett was seated at a table inside the house when Berger conducted his search; her small children had been removed to a different premises.  (Tr. III, 181-82.)  During his search, Berger did not find any residency paperwork linking Petitioner to 5969 Cadillac Street.  (Tr. III, 194-95.)

Michigan State Police Detective Lieutenant and COMET member Richard Margosian testified as follows.  Margosian assisted in the execution of the search warrant at 5969 Cadillac Street on January 17, 2001, leading the raid team that searched inside the residence.  (Tr. III, 210.)  Margosian also arrested Petitioner that day.  He identified Petitioner at trial.  (Tr. III, 210-11.)  On January 17, Margosian saw Lieutenant Horton approach the tan Cadillac and pull Petitioner out; then he saw Petitioner trying to get away.  (Tr. III, 212-13.)  Margosian ran toward them, trying to holster his gun, but dropped his holster, so he held his gun in his right hand, down by his right side.  (Tr. III, 214, 224, 226.)  Margosian and Horton were both wearing raid jackets with "Police" written in four- or five-inch letters across the front and back.  (Tr. III, 239.)  Margosian yelled at Petitioner to get down and pushed him to the ground, but Petitioner crawled to Horton's unmarked and running vehicle and placed his hand on the floorboard thereof.  (Tr. III, 214.)  Margosian wrestled and forced Petitioner to the ground, protecting his gun so Petitioner would not try to get it, but Petitioner continued to struggle, his hand still on the floorboard of Horton's car.  (Tr. III, 214-15, 234-35.)  Lieutenant Taylor arrived and took Margosian's gun; then with the assistance of several other officers, Margosian was finally able to handcuff Petitioner's left hand, and Horton handcuffed Petitioner's right hand.  (Tr. III, 215-16, 227-29.)  Margosian never pointed his gun at Petitioner.

(Tr. III, 227.)  This entire incident of apprehending and cuffing Petitioner took approximately 30 seconds.  (Tr. III, 217.)  Margosian then went into the house.  (Tr. III, 233.)  As one of two supervising Lieutenants with Lieutenant Taylor, Margosian opted not to write a report of the incident because Taylor and other officers wrote reports.  (Tr. III, 241-42.)

Michigan State Police Detective Lieutenant and COMET task force member Amos Horton testified as follows.  On January 17, 2001, Horton was assigned to apprehend someone named Puff as Puff approached 5969 Cadillac Street in a brown Cadillac.  (Tr. IV, 6.)  Puff was described to Horton as a heavy-set black male with Chinese-looking eyes.  (Tr. IV, 6.)  When Puff pulled up in front of the house at 5969 Cadillac, Horton drove north on Cadillac Street, followed by officers in an unmarked raid van and a marked police car with its lights flashing.  (Tr. IV, 7.)  Horton exited his vehicle and made contact with Petitioner at the door of the Cadillac.  (Tr. IV, 7, 9.)  Horton was wearing overalls that said "Police" on them, a large raid vest that said "Police" on the front and back, and a hat that said "Police" on it.  (Tr. IV, 8.)  While reaching to open the door of Petitioner's car, Horton advised Petitioner and the passenger to raise their hands, and identified himself as police.  (Tr. IV, 9.)  Horton had his 40-caliber pistol in his hand, pointed to the ground at his side.  (Tr. IV, 9-10.)  Petitioner looked at Horton for a few seconds, put his hands up, and, upon exiting the vehicle, Petitioner began to take off as if to flee northbound on Cadillac Street.  (Tr. IV, 10-12.)  Horton went low, hit Petitioner, and the two fell to the ground.  (Tr. IV, 12.)  Horton lay on top of Petitioner trying to hold him down; Petitioner got up on all fours and began to crawl, dragging Horton, whose arm was wrapped around Petitioner's legs.  (Tr. IV, 12.)  Horton was yelling to Petitioner to get down and that Petitioner was under arrest.  (Tr. IV, 12-13.)  Petitioner reached Horton's car, whose door was open, and reached up to pull on the rocker panel.  (Tr. IV, 12.)  Lieutenant Margosian jumped on Petitioner and pinned him to the ground next to Horton's car.

- 14 -

(Tr. IV, 13.)  Horton did not notice whether Margosian's gun was drawn.  (Tr. IV, 13-14.)  Other officers then helped cuff Petitioner with two sets of handcuffs, and took Petitioner to a police car. (Tr. IV, 12-14, 16.)  Horton could not recall whether he himself had placed either set of handcuffs on Petitioner.  (Tr. IV, 14-16.)  At trial, Horton identified Petitioner as the man he struggled with. (Tr. IV, 16.)  Petitioner initially complained that his knee was broken after the arrest, which turned out not to be the case.  (Tr. IV, 16-17.)

Horton testified that on January 18, 2001, Lieutenant Taylor contacted Horton to assist in interviewing Petitioner after Petitioner informed Taylor that he wanted to talk.  (Tr. IV, 17, 35.)  Horton and Taylor spoke with Petitioner on January 18 at the Macomb County Jail in an interview room that was approximately ten feet by ten feet.  (Tr. IV, 17-18.)  Horton was unarmed and in plain clothes.  (Tr. IV, 19.)  Petitioner identified his main source of cocaine as someone nicknamed "Dee," which corroborated information Horton had received from other sources.  (Tr. IV, 19-20.)  Petitioner identified as an additional source of cocaine someone nicknamed "Fat Lady," whom Horton had not heard of, but was able to identify later as Christina Flemans.  (Tr. IV, 20-21.) Petitioner's counsel objected to this line of questions as unduly prejudicial.  The court overruled the objection, finding the information went to "the defendant's character as to what he knows, who he hangs with, and whatever."  (Tr. IV, 21-23.)  According to Horton, Petitioner told him that the cocaine found inside 5969 Cadillac on January 17 belonged to him, and not to his sister or any other occupant of the house.  (Tr. IV, 23-24.)  Petitioner stated that the powder cocaine found at 5969 Cadillac had come from Dee, and that crack cocaine had come from Christina/the Fat Lady.  (Tr. IV, 24.)  Petitioner also told Horton that he sold narcotics for a living and obtained kilo quantities of cocaine on a regular basis from Dee and Christina, for which he paid $24,500 per kilo.  (Tr. IV, 24.)  Petitioner contacted Christina Flemans by phone during the interview.  (Tr. IV, 24-25.)  Horton

- 15 -

tried unsuccessfully to conduct a follow-up investigation on both Dee and the Fat Lady.  (Tr. IV, 25-26.)

On cross-examination, Horton testified that he had not filled out a Constitutional Rights Form prior to interviewing Petitioner because Taylor already had executed one and had begun questioning Petitioner before Horton arrived.  (Tr. IV, 32, 49.)  Horton also understood that Petitioner had been advised of his rights.  (Tr. IV, 33.)  Horton never personally advised Petitioner that anything Petitioner said could be used against him.  (Tr. IV, 37.)  Horton did not record in writing any of Petitioner's admissions during the interview, nor was the interview taped.  (Tr. IV, 45, 50.)  Horton was more interested in information Petitioner could give regarding others involved in the sale of cocaine.  (Tr. IV, 47, 50.)  Horton denied that he had offered to "let [Petitioner] out of jail" in exchange for Petitioner's assistance in investigating other drug offenders with the COMET task force.  (Tr. IV, 70-71.)  Horton denied putting his gun to Petitioner's head, putting Petitioner in a choke hold, and/or slamming Petitioner's head into his car during Petitioner's January 17 arrest.  (Tr. IV, 78, 80, 83.)  Rather, Horton testified that he "latched on" to Petitioner when Petitioner started to run and attempted to flee immediately upon exiting his car.  (Tr. IV, 83-84.)  Horton tackled Petitioner to the ground; Petitioner tried to crawl away.  (Tr. IV, 85.)  Horton did not believe Petitioner was trying to hurt him, but believed that Petitioner was trying to get away and therefore was not cooperative with arresting officers.  (Tr. IV, 85-87.)  Horton did not know whether Taylor had his weapon in his hand during the attempt to handcuff Petitioner.  (Tr. IV, 90-91.)  Horton doubted Berger had his weapon drawn during the attempt to handcuff Petitioner.  (Tr. IV, 94.)  Horton testified that Petitioner made no statement to Horton regarding a drug transaction.  (Tr. IV, 97.)  Horton never asked Petitioner if he was "Puff."  (Tr. IV, 98.)  Counsel challenged the credibility of Horton's claim that Petitioner had voluntarily informed officers that he owned the

cocaine without promises or coercion.  (Tr. IV, 106-07.)  Horton acknowledged that he did not record Petitioner's statement on tape or write a verbatim transcript.  (Tr. V, 9-10.)  He also did not ask Petitioner to write his own statement.  (Tr. V, 10.)  Horton further acknowledged that Tamika Burnett was not arrested at the scene, despite the fact that between 600 and 900 grams of cocaine were found in her home.  (Tr. V, 33-34, 36.)

        Michigan State Police Trooper John Scholtz testified that he serves as a canine officer working with his dog, "Bach," to perform narcotics detection, among other things.  (Tr. V, 54-55.)  On January 17, 2001, he was called by officers from COMET to assist in stopping a vehicle suspected of transporting narcotics.  (Tr. V, 55-56.)  He assisted in the execution of a search warrant at 5969 Cadillac in the City of Detroit.  (Tr. V, 56.)  When he arrived at the scene, the street was very crowded and he parked some distance from the house.  (Tr. V, 57-58.)  He assisted Lt. Horton in taking into custody one of the passengers from the vehicle parked in front of the house.  (Tr. V, 58, 87.)  While he was involved with the passenger, Lt. Margosian struggled with Petitioner.  Scholtz saw both Margosian and Petitioner on the ground at some point.  (Tr. V, 59, 85, 89.)  He did not remember whether other officers assisted Margosian.  (Tr. V, 93.)  The struggle was resolved by the time Scholtz completed his own arrest.  (Tr. V, 59.)  Scholtz then retrieved his dog and proceeded inside the residence.  (Tr. V, 59.)  He and Bach first cleared the upstairs, finding nothing. As he came down the stairway toward the main floor, he examined a storage compartment located overhead.  (Tr. V, 60.)  Behind a wood board over the wall, he found a Ziploc freezer bag.  (Tr. V, 61.)  He signaled an officer to take pictures and seize the item.  He then proceeded to search the first floor of the residence.  (Tr. V., 61.)  Scholtz identified People's Exhibit 3 as a small cooler found in the master bedroom of the residence, which Bach had signaled for the presence of narcotics.  (Tr. V, 62.)  The cooler contained a baggie with approximately 15 grams of marijuana.  (Tr. V, 112.)

He again notified the officers and continued to search the bedroom.  Bach again signaled near the window, where Scholtz located a small sandwich baggie containing what appeared to be crack cocaine.  (Tr. V, 63.)  Scholtz identified People's Exhibit 30.  (Tr. V, 63.)  He searched the remainder of the residence, but Bach did not signal again.  (Tr. V, 64.)  Scholtz then left the house and searched the car from which Petitioner had been removed.  (Tr. V, 64.)  No drugs were found in the vehicle.  (Tr. V, 80.)

On cross-examination, Scholtz acknowledged that filing an incident report was standard protocol and that he had completed a report as required.  (Tr. V, 68-73.)  Scholtz testified that his incident report identified Wayne County as the venue for his actions, not mentioning Macomb County.  (Tr. V, 75-76.)  The incident report also did not indicate that Scholtz had searched the vehicle Petitioner had been driving.  (Tr. V, 83-84.)  Scholtz did not see where Petitioner was taken after his arrest and did not witness anyone reading Petitioner his rights.  (Tr. V, 117.)

Michigan State Police Lieutenant Chris Flo testified as a laboratory specialist with the Michigan State Police Crime Laboratory, where he had served for 28 years.  (Tr. V, 119-20.)  Flo identified People's Exhibit 1 as 528.6 grams of cocaine received and tested by himself at the laboratory on February 26, 2001.  (Tr. V, 122-23.)  Flo also testified that People's Exhibit 2 was 317.42 grams of free-base or crack cocaine.  (Tr. V, 125-26.)  People's Exhibit 4 was identified by Flo as a heat-sealed baggie containing 62.77 grams of crack cocaine.  (Tr. V, 129.)  Finally, People's Exhibit 12 was identified as 28.12 grams of powder cocaine.  All identified substances described by Flo were received from the COMET unit.  (Tr. V, 130-31.)  Flo acknowledged that the powder cocaine weights reflected the total mixture weights, which may have contained other substances as well.  (Tr. V, 137-42.)  Crack cocaine, in contrast, tends to be close to pure cocaine because the preparation process eliminates other substances.  (Tr. V, 146-47.)

Stephen Nowicki testified as a sergeant in the Michigan State Police Crime Lab latent fingerprint unit. (Tr. V, 175.) According to his testimony, Nowicki examined fingerprints taken from Petitioner, who went by the name Robert Charles Hall. He compared the fingerprints to the Automated Fingerprint Identification System and found they matched those of Isadore L. Hall. (Tr. V, 177-78.) On February 26, 2001, Nowicki was asked to examine several plastic baggies, a glass jar and a measuring cup to see if he could obtain latent fingerprints from them. (Tr. V, 179.) Nowicki obtained several prints, none of which matched Petitioner's prints. (Tr. V, 180.)

Detective Mark Grammatico of the Macomb County Sheriff's Department testified that on January 16, 2001, he assisted in the investigation of a cocaine narcotic case. (Tr. V, 198-99.) Together with Detectives Sims and Dowell, he conducted surveillance on Hagerman and Weaver. (Tr. V, 200.) He and Sims were in an unmarked vehicle at Harper and Cadieux streets. Haggerman drove a black pickup truck in which Weaver was a passenger. Hagerman and Weaver were given money to purchase cocaine. (Tr. V, 200-01.) Grammatico was in radio contact with several officers in other vehicles. (Tr. V, 201.) Grammatico and Sims planned to perform a traffic stop on Hagerman and Weaver's vehicle once they had received the cocaine. (Tr. V, 202.) After receiving the cocaine, Hagerman and Weaver proceeded eastbound on I-94 from Cadieux. Grammatico and Sims followed directly behind the vehicle and contacted St. Clair Shores Police Department. (Tr. V, 202-03.) The vehicle exited the highway at Nine Mile Road in Macomb County, turning right on Nine Mile and right again on a side street. (Tr. V, 203.) Weaver jumped out of the vehicle and began running into area backyards. He was chased through the first backyard and was apprehended. (Tr. V, 203.) Within 20 to 30 feet of Weaver, Grammatico found People's Exhibit 11. (Tr. V, 204-05.) Weaver was placed in a St. Clair Shores marked patrol unit. (Tr. V, 205.) Hagerman continued in the pickup down the street and got away from the scene. (Tr. V, 205-06.)

On January 17, 2001, Grammatico was involved in the search of the premises at 5969 Cadillac in Detroit.  (Tr. V, 207.)  He was third in the door and secured the suspects in the residence, Tamika Burnett and her two young children.  (Tr. V, 207.)  Grammatico observed Petitioner approach the area as he was entering the house.  He asked Burnett if she knew the man outside.  She referred to the man as "Puff."  (Tr. V, 208.)

Grammatico confirmed on cross-examination that, before he followed Hagerman and Weaver, he had information from a confidential informant that someone called "Puff" had sold Haggerman and Weaver drugs.  (Tr. V, 216.)  The confidential informant had made the purchases from Puff at 5969 Cadillac.  (Tr. V, 217.)  Grammatico acknowledged that he did not see any purchase of cocaine between Hagerman or Weaver and Petitioner.  (Tr. V, 220.)

Grammatico testified on cross-examination that Mt. Clemens Police Officer Sue Sherwood assisted the team in investigating the case.  (Tr. VI, 5, 10-11.)  She was present during the execution of the search warrant at 5969 Cadillac.  (Tr. VI, 12.)  Mt. Clemens Police Officer Josh Lewis, Mr. J. Cohoe and Mr. James Fraser all were present during the execution of the search warrant.  (Tr. VI, 5, 14.)

Grammatico was present when Detective Sims interviewed Weaver.  The interview was recorded.  (Tr. VI, 16, 18.)  Sims read Weaver his *Miranda* warnings.  (Tr. VI, 17.)  Grammatico acknowledged that, when persons have agreed to confess or to be interviewed, they frequently are recorded.  (Tr. VI, 19-20.)  Grammatico did not remember ever taking a written confession during his ten years as a police officer.  (Tr. VI, 21.)  Grammatico acknowledged that he had no personal knowledge that Hagerman and Weaver were connected in any way to Petitioner.  (Tr. VI, 32.)  Grammatico had heard the name "Puff" mentioned during the course of the investigation.  (Tr. VI, 40.)  Grammatico assisted Sims in obtaining a warrant for Tamika Burnett's

arrest two weeks before Petitioner's trial in the instant case.  (Tr. VI, 72.)  Burnett was a fugitive at the time of trial.  (Tr. VI, 77.)  Grammatico acknowledged that, had he been the decisionmaker, he would have brought a warrant against Burnett at the time the cocaine was found in her house.  (Tr. VI, 79.)  According to Grammatico, Petitioner's car had been stopped while traveling on the street in front of Burnett's house; it was not parked at the curb.  (Tr. VI, 90.)  Before entering the house to execute the search warrant, Grammatico saw Margosian and Horton struggling with Petitioner.  (Tr. VI, 95.)  Grammatico, however, did not report the struggle in his incident report.  (Tr. VI, 101.)

St. Clair Shores Police Detective James Cohoe testified that he assisted in the execution of the search warrant on 5969 Cadillac.  (Tr. VI, 118.)  He did not file a police report, however, as he was just assisting other officers.  (Tr. VI, 118.)  Cohoe also assisted the COMET team by requesting that a marked St. Clair Shores Police car execute a traffic stop on Hagerman and Weaver's car.  (Tr. VI, 122.)  Cohoe was with Sims while Sims questioned Weaver.  (Tr. VI, 127.)

The prosecution next called Detective (unknown) Fraser, who worked as an undercover officer in the narcotics unit of the St. Clair Shores Police Department.  (Tr. VI, 132.)  Fraser assisted Cohoe in the search of 5969 Cadillac.  (Tr. VI, 133.)  Fraser also did not file a police report.  (Tr. VI, 135.)

Chesterfield Township Police Detective Brian Dowell testified that he is assigned to COMET.  (Tr. VI, 136.)  Dowell assisted in the search at 5969 Cadillac, and he completed the return and tabulation of what was taken from the house.  (Tr. VI, 137.)  Among the items received and tabulated by Dowell were documents evidencing Tamika Burnett's residency at the searched address.  (Tr. VI, 146-48.)

Detective David Guzdziol of the Macomb County Sheriff's Department testified that he was a crew leader of COMET.  (Tr. VI, 150.)  He arrived at 5969 Cadillac shortly after Petitioner was taken into custody, and he searched Petitioner.  (Tr. VI, 150-51.)  In his search, Guzdziol discovered a key to 5969 Cadillac in Petitioner's pants pocket.  (Tr. VI, 151-52.)  Guzdziol also found Petitioner's wallet containing his Michigan Identification Card and $200 in cash.  (Tr. VI, 154, 157.)  Petitioner's Michigan Identification Card identified him as "Robert Charles Hall."  (Tr. VI, 156.)  Guzdziol also found $1,038 in Petitioner's pants pocket.  (Tr. VI, 154, 157.)  Petitioner also was in possession of two cellphones identified as People's Exhibits 9 and 10.  (Tr. VI, 155.)  Although Guzdziol did not note it at the time of the search, the wallet also contained a vehicle registration for the Cadillac Petitioner was driving, showing the car registered to Valerie Hall Love.  (Tr. VI, 186-87.)  The address on the vehicle registration was the same as the address on Petitioner's Michigan Identification Card.  (Tr. VI, 189.)  In addition, the wallet contained a voter registration application in Petitioner's name that listed the same address.  (Tr. VI, 207.)

Officer Burton Hulett of the St. Clair Shores Police Department testified that on January 16, 2001, he received a call to assist COMET by stopping a black Ford pickup suspected to be involved in trafficking narcotics.  (Tr. VII, 5.)   When he, together with Officers Rood and Spangler, attempted to stop the vehicle, the passenger ran from the vehicle.  (Tr. VII, 5-6.)  Hulett did not participate in the footchase after the passenger.  (Tr. VII, 6.)  Hulett did not create an incident report because COMET took over the situation.  (Tr. VII, 12.)

St. Clair Shores Police Officer Jennifer Spangler testified that she and Officer Rood participated as backup officers in the attempted stop of the black pickup.  (Tr. VII, 14-15.)  Officers Hulett and Price made the attempted stop.  (Tr. VII, 15.)  She and Officer Rood assisted in the

- 22 -

footchase after the escaping passenger.  (Tr. VII, 16.)  A COMET officer at the scene was closer, however, and made the stop.  (Tr. VII, 16.)  She made no incident report.  (Tr. VII, 18.)

Mt. Clemens Police Officer Susan Sherwood participated as part of the COMET unit in searching 5969 Cadillac.  (Tr. VII, 20-21.)  She had been inside a van located down the street when she was told to execute the search warrant.  (Tr. VII, 21.)  As she approached the house, she saw other undercover officers scuffling with people out front, though she did not see or recognize Petitioner.  (Tr. VII, 21.)  Sherwood conducted a pat-down search of Tamika Burnett for the security of the search team.  (Tr. VII, 22-23, 26.)  She then searched a bedroom and the kitchen.  (Tr. VII, 24.)  She did not personally locate any drugs.  (Tr. VII, 26.)

Officer Thomas Price of the St. Clair Shores Police Department testified that he was asked to make a traffic stop, during which the passenger fled on foot and Price was one of several officers in pursuit.  He did not catch the passenger and he had no further involvement with the case.  (Tr. VII, 46-47.)  Similarly St. Clair Shores Officer John Rood was involved in the chase.  Rood reached the passenger, Weaver, at the same time as a COMET officer.  (Tr. VII, 49, 51.)  Rood previously had had contact with Richard Hagerman through the St. Clair Shores Narcotics Unit.  (Tr. VII, 50-51.)  Rood was aware that narcotics were found between the houses, though he did not see Weaver drop those narcotics.  (Tr. VII, 52-53.)

The prosecutor moved to strike Tamika Burnett as a witness on the grounds of unavailability.  (Tr. VII, 58.)  Detective William Hanger testified that there was an arrest warrant out for Burnett and that he and other officers had made four attempts to serve her with a subpoena or arrest her during the past week.  They also tried other addresses in Detroit and Hamtramck where other relatives were believed to live.  (Tr. VII, 59, 65-66, 67-68.)  Hanger testified that neighbors reported that her car had not been at the house recently, though the post office still delivered mail

to the address.  (Tr. VII, 61, 66-67.)  Mail would accumulate for a few days and then be picked up by someone.  (Tr. VII, 61, 67.)

Detective Joshua Lewis of the Mt. Clemens Police Department testified that he participated in the search of 5969 Cadillac on January 17, 2001.  He identified as People's Exhibit 31 as a digital scale he found in the kitchen at that address.  (Tr. VII, 78-79.)  He turned the scale over to Officer Dowell for tabulation.  He did not complete a police report about his involvement in the search.  (Tr. VII, 81-82.)  Lewis spoke with Burnett about what was going on in the house.  (Tr. VII, 89.)  He attempted to obtain a statement from her.  (Tr. VII, 90-91.)  He provided her with a statement form advising her of her rights, which she signed.  (Tr. VII, 92.)  He told her to write down what she wanted to say.  (Tr. VII, 93.)

Macomb County Sheriff's Deputy Robert Taylor was the detective-lieutenant in charge of the COMET crew.  (Tr. VII, 101.)  The COMET team had statewide jurisdiction as a task force of the State Police.  (Tr. VII, 102.)  At the beginning of the year, on approximately January 10, 2001, Taylor was brought into an investigation on information about narcotics being brought into Macomb County by Hagerman and Weaver.  (Tr. VII, 104.)  He had descriptions of Hagerman and Weaver as white males living in Chesterfield Township, and of Puff, a black male.  (Tr. VII, 105.)  The team had an informant who had told officers that a narcotics transaction could be made from Hagerman and Weaver.  (Tr. VII, 106.)  Once Hagerman and Weaver completed the transaction and Weaver was arrested, the crew immediately focused its investigation on where the narcotics came from.  (Tr. VII, 106.)  Taylor was first introduced to the confidential informant by Berger and Sims at an arranged location to find out if he had any useful information.  They started a controlled purchase to determine the confidential informant's reliability.  (Tr. VII, 107-08.)  Taylor provided $800 of prerecorded buy funds and then conducted surveillance on the informant's activities.  (Tr.

- 24 -

VII, 109.)  He went to a residence in Detroit, 5969 Cadillac, and made a narcotics purchase.  (Tr.

VII, 109, 113.)  There was a gold-colored Cadillac parked in front of the residence.  (Tr. VII, 113.)

After the transaction, the confidential informant met with Taylor and other officers at another

arranged location.  (Tr. VII, 110.)  The informant handed over a quantity of cocaine, identified as

People's Exhibit 12.  He was then searched for drugs and money.  (Tr. VII, 112.)  The cocaine

involved was 29.2 grams. (Tr. VII, 112.)  Berger or Sims returned the cocaine to the COMET office,

where it was secured as evidence.  (Tr. VII, 113-14.)  Taylor did not return to 5969 Cadillac that

day, though he instructed Berger to drive by several times and collect license plates, which Berger

did.  (Tr. VII, 115-16.)

On January 17, 2001, the crew, led by Lt. Margosian, executed a search warrant at

5969 Cadillac.  (Tr. VII, 116.)  Taylor at that time was conducting surveillance on the gold-colored

Cadillac that had been observed at the residence, which they believed was being driven by "Puff."

(Tr. VII, 117, 118.)  The Cadillac was at a repair shop in Detroit on the afternoon of January 17.

Taylor continued to observe the vehicle, staying in touch by radio with Sims and the other members

of the team. (Tr. VII, 119.)  COMET officers made arrangements through the confidential informant

to purchase a half of a kilo of crack cocaine from Puff.  (Tr. VII, 119.)  While they were observing,

the garage door was opened, and they could see the vehicle in one of the bays.  Sometime later, the

vehicle exited the repair shop and proceeded eastbound on Seven Mile Road. (Tr. VII, 120.)  Berger

and Taylor, in separate cars, observed the vehicle proceed to the area of Seymour and Hayes in

Detroit, where it drove in a pattern that suggested the driver was attempting to ascertain if he was

being followed.  (Tr. VII, 121-22.)  The vehicle then drove to an address on Ansbury, where the

driver entered the residence.  (Tr. VII, 125.)  Berger then took over visual contact with the suspect

and vehicle.  Ten minutes later, Taylor again observed the vehicle, seeing two occupants.  (Tr. VII,

125-26.)  The vehicle was followed to 5969 Cadillac, where it stopped in front of the residence.

(Tr. VII, 127, 130.)  Taylor positioned his vehicle down the street from the residence.  There were

a lot of other vehicles in the area.  As he was positioned there, he observed the raid van pull down

the street with the K9 unit.  (Tr. VII, 128.)  The house was then raided.  Taylor parked his car in a

driveway about seven or eight houses away.  (Tr. VII, 130.)  He then ran to the house, where he

assisted Margosian and Horton.  Margosian handed Taylor his weapon, which Taylor placed in the

back of his waistband.  (Tr. VII, 130-31.)  An intense struggle followed between Margosian, Horton

and Petitioner, during which Petitioner failed to comply with the officers.  Taylor drew his gun and

repeatedly yelled, "stop resisting."  (Tr. VII, 131.)  Hall's hands were under his body and Taylor

could not see if there was anything in his hands.  (Tr. VII, 132.)  Taylor was concerned about the

safety of the officers because at least one of them had a gun that could get lost in the struggle.

(Tr. VII, 133.)  Petitioner eventually was restrained and placed in handcuffs.  (Tr. VII, 133.)  Horton,

Margosian and Berger were all involved in bringing Petitioner under control.   (Tr. VII, 133.)

Petitioner was then placed in the rear of an unmarked car.  (Tr. VII, 134.)  Shortly thereafter, Taylor

went over to Petitioner and read him his *Miranda* rights.  (Tr. VII, 134-35.)  He checked on the

condition of the officers, who were winded.  He then proceeded to the residence to check on the

progress of the search.  (Tr. VII, 135.)  He was shown the quantities of cocaine that had been

located, which he subsequently identified in court.  (Tr. VII, 135-36.)  He took photographs of the

evidence in the state in which it was found.  (Tr. VII, 136.)  He identified Exhibit 25 as a picture he

had taken.  (Tr. VII, 136.)

According to Taylor, Burnett was handcuffed during the search.  (Tr. VII, 137.)  The

children were not secured, but they sat at the table with their mother.  (Tr. VII, 137.)  Burnett

provided information to Taylor, and he instructed Lewis to obtain a written statement.  (Tr. VII,

139.)  The following day, Taylor met with Petitioner at the Macomb County Jail.  (Tr. VII, 140.)

        The judge excused the jury for lunch and defense counsel proceeded to question Taylor about the statement Petitioner allegedly made at the Macomb County Jail.  (Tr. VII, 142.) Taylor acknowledged that he had no written statement from Petitioner.  (Tr. VII, 142.)  Taylor stated that, following the jail interview, he memorialized in his incident report the oral statements made by Petitioner.  (Tr. VII, 143.)  Taylor acknowledged that the money taken from Petitioner at 5969 Cadillac was not in evidence for the jury because it had been forfeited.  (Tr. VII, 145.)  Taylor was not the person responsible for placing money into the custody of the police and keeping it for trial. (Tr. VII, 145.)  Moreover, the photographs Taylor took did not include pictures of the money taken from Petitioner.  (Tr. VII, 146.)  Taylor testified that he had only a receipt that the money had been brought to the COMET office and entered into property.  (Tr. VII, 146.)

        On the basis of Taylor's testimony, defense counsel requested that the court strike all reference to the money as the exhibits referring to the money did not meet the requirements of MICH. R. EVID. 901.  (Tr. VII, 148.)  Defense counsel further requested that evidence of Petitioner's statements be stricken, as they were not in Petitioner's own words and were therefore hearsay.  (Tr. VII, 150.)  The court heard extensive arguments on the failure of the government to preserve and produce the money as evidence under the best evidence rule, MICH. R. EVID. 901.  (Tr. VII, 151-177.)  Following these arguments, the parties and the court agreed that Petitioner would withdraw Exhibits A through D, that the court would give an instruction at the end of the case indicating that forfeiture is a separate action that was still pending and that the jury could not use anything about the forfeiture against Petitioner.  The jury was to be further instructed that, because the money was not produced, the documents would be withdrawn because the jury could not compare all of the

money to the serial numbers.  The jury would be instructed that they were not to consider the photographs of the marked money.  (Tr. VII, 178-180, 186-88.)

The parties then argued Petitioner's motion to strike evidence concerning his statement on the grounds that it had not been recorded in some fashion.  (Tr. VII, 181-85.)  The court determined that the statement was admissible.  (Tr. VII, 186.)  The court would, however, permit evidence that officers noticed that nine bills appeared to be the same as those given to Hagerman and Weaver the previous day.  (Tr. VII, 188.)

The jury was brought back into the courtroom and Taylor continued his testimony. (Tr. VII, 193.)  Taylor identified People's Exhibit 29, a wallet containing a Michigan social security card in the name of "Robert Charles Hall."  The wallet also contained a receipt from Smith's Wrought Iron Works, identified as Exhibit 27.  (Tr. VII, 194-95.)  The receipt, apparently issued in December 2000, was for the making and installation of a bar door for Petitioner for the address 5058 Chatsworth.  (Tr. VII, 196.)  The receipt also recorded a telephone number, 516-0110, which was the number of one of the phones found in Petitioner's possession and was the number dialed by Detective Sims before handing the phone to the confidential informant to arrange a drug transaction. (Tr. VII, 196.)

Taylor testified that, on January 18, 2001, in response to a call from the jail, he went to the Macomb County Jail to speak to Petitioner.  (Tr. VII, 197.)  Petitioner told Taylor he wished to speak with him about the situation that had occurred the previous day.  (Tr. VII, 198-99.)  Taylor read Petitioner his rights and Petitioner signed the warning and waiver form.  (Tr. VII, 199.) Petitioner told Taylor that the drugs found in the house were his, though the marijuana belonged to Tamika Burnett.  (Tr. VII, 200.)  Taylor advised Petitioner that, due to the nature of his statement, Taylor would need to bring in another officer.  (Tr. VII, 200.)  Taylor testified that he did not recall

mentioning the existence of narcotics in the house.  (Tr. VII, 201.)  Petitioner then stated that he had

received the narcotics the previous day from a subject by the name of "Dee."  (Tr. VII, 202.)  The

interview terminated shortly thereafter.  (Tr. VII, 202.)  Taylor returned to the jail with Lt. Horton

at approximately 4:00 p.m. the same day.  Taylor reminded Petitioner of his rights, and the two

officers began questioning him.  Petitioner told the officers that he did not work, and that he sold

between three and four kilos of cocaine each week.  Petitioner testified that his source was "Dee,"

who lived on Dwyer or Hasse Street in Detroit.  (Tr. VII, 203.)  Taylor questioned Petitioner about

the name of "Robert Charles Hall," when his real name was Isadore Lamarr Hall.  Petitioner did not

deny his real name.  (Tr. VII, 204.)  Petitioner also provided the telephone numbers for the two cell

phones taken from him during his arrest.  (Tr. VII, 204.)

Before cross-examination of Taylor was completed, the prosecutor advised the court

that Tamika Burnett had voluntarily agreed to be picked up and was available to testify.  She was

advised after being picked up that she would be arrested and processed on the outstanding warrant

immediately following her testimony.  (Tr. VIII, 3-5.)  Defense counsel argued strenuously that the

posture of the case and Burnett having never been advised by counsel, should bar introduction of

her testimony.  (Tr. VIII, 6-10.)  The court held that Burnett would not be allowed to testify until

after she had spoken with an attorney.  (Tr. VIII, 11.)  Counsel was obtained who, after consulting

with Burnett, stated on the record Burnett's intent to invoke her privilege against self-incrimination.

(Tr. VIII, 12-14.)  Burnett therefore was declared unavailable and did not testify.  (Tr. VIII, 16.)

Taylor was returned to the stand.  On cross-examination, Taylor acknowledged that,

while he used a statement form in his interview with Burnett, he did not obtain a signed statement

from Petitioner.  (Tr. VIII, 19.)  Taylor testified that Petitioner was first arraigned on January 18,

2001, for delivery and manufacture of between 50 and 225 grams of cocaine.  (Tr. VIII, 21, 24.)  He

was not arraigned on 650 grams until some days later, notwithstanding the fact that, according to Taylor, he admitted to Taylor on January 18 that the drugs inside the house belonged to him. (Tr. VIII, 24-25.)  Taylor acknowledged that Petitioner did not admit to ownership of the drugs at the scene.  (Tr. VIII, 30.)  Taylor further acknowledged that he told Petitioner that he could be sent away for life, but that, if he cooperated, Taylor would let him out of jail to work for the government. (Tr. VIII, 39, 43.)  Taylor did not prepare a witness statement for Petitioner to sign.  (Tr. VIII, 49.) Nor did he ensure that Petitioner had an attorney.  (Tr. VIII, 62-64.)  Taylor also acknowledged that, while he was aware of the name "Puff" with whom the confidential informant was dealing, he had no idea of Puff's identity.  (Tr. VIII, 178.)

On redirect, the prosecutor asked the court to take judicial notice of the court file and to use it to refresh Taylor's recollection as to the charges in the warrant.  (Tr. VIII, 193-94.)  Taylor testified that the original warrant charged conspiracy to deliver or manufacture between 50 and 225 grams of a controlled substance, delivery and manufacture of 650 grams or more of a controlled substance, and resisting and obstructing an officer.  (Tr. VIII, 194.)  Taylor went on to say that he believed the charges presently pending were different, including a conspiracy charge to deliver more than 650 grams.  (Tr. VIII, 194-95.)  Defense counsel moved to make a record outside the presence of the jury after Taylor's testimony.  (Tr. VIII, 196.)  Taylor's testimony concluded the day's evidence.

The following morning, defense counsel moved for a mistrial on the grounds that Taylor had interjected into the case a charge of conspiracy for more than 650 grams, a charge that was not before the jury.  (Tr. IX, 5.)  Counsel further argued that the court had made disparaging remarks to defense counsel about the nature of his cross-examination questions and that the jury had engaged in inappropriate behavior, laughing and talking in court, without admonishment from the

court.  (Tr. IX, 5-8.)  The court stated that it was convinced that the jury at that time had become

frustrated and was not adequately protecting Petitioner's rights.  Therefore, the judge indicated, she

would grant a mistrial, but without prejudice to a new prosecution.  (Tr. IX, 13-14.)  Defense

counsel argued, however, that the mistrial should not be granted on the basis of an exhausted jury,

but instead on the basis of prejudice caused by the prosecution and disdain for the defense.  (Tr. IX,

15-16.)  After further argument and at the request of the prosecutor  (Tr. IX, 24-34), the court

brought each juror in for examination about his or her ability to maintain attention and to render a

fair and impartial judgment.  The court also inquired whether the jury had been discussing the case

or had reached any conclusions about Petitioner's guilt or innocence.  (Tr. IX, 34-66.)  At the end

of juror interrogations, defense counsel stated that he believed the jury could be fair and impartial.

He maintained his objection, however.  (Tr. IX, 66-67.)  The court also retracted her concerns about

the jury and allowed the trial to proceed.  (Tr. IX, 68.)  Defense counsel renewed his objection to

the testimony regarding the charge of conspiracy involving more than 650 grams.  The trial judge

indicated that she would either give a curing instruction or read the indictment again at the time of

jury instructions.  (Tr. IX, 69.)

        The prosecution rested.  (Tr. IX, 76.)  The defense moved for a directed verdict based

on the insufficiency of the evidence on all counts.  (Tr. IX, 80-107.)  The court denied the motion

as to the conspiracy count, though she expressed an opinion that the case was tenuous.  (Tr. IX, 97-

98.)  The court also ruled that, although the evidence was thin on the possession charge, the

Petitioner's statement was sufficient to create a jury question on that charge.  (Tr. IX, 108.)  The

court concluded that sufficient evidence had been presented on the charge of resisting or obstructing

a police officer.  (Tr. IX, 110-11.)  The defense rested without introducing additional evidence.

(Tr. X, 5.)

At the conclusion of trial, on February 1, 2002, the jury found Petitioner guilty of possession with intent to deliver 650 grams or more of cocaine and of resisting and obstructing a police officer.  Petitioner was acquitted on Count I, which charged conspiracy to deliver 50 to 224 grams of cocaine.  (Tr. Vol. XI, 122-23.)  On March 18, 2002, Petitioner was sentenced to serve a term of imprisonment of twenty to forty years on the possession count, followed by a consecutive term of one to two years on the count of resisting arrest.   (Sentencing Transcript, ("S. Tr."), 5-7, docket #36.)

### B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on June 26, 2003, raised the following issues:

I.     DID THE COURT ERR BY ALLOWING INTO EVIDENCE THE CI'S STATEMENTS THAT THE DEFENDANT WAS PUFF, THE DETAILS OF THE ALLEGED BUY, AND STATEMENTS OF A RESIDENT OF THE HOME INVOLVED, ALL OF WHICH WERE HEARSAY, AND VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHTS?

II.    DID THE COURT IMPROPERLY MAKE THE SENTENCE FOR THE DEFENDANT'S CONVICTIONS CONSECUTIVE?

III.   DID THE PROSECUTOR'S ACTIONS DENY THE DEFENDANT A FAIR TRIAL AND HIS DUE PROCESS RIGHTS?

IV.    WAS THERE SUFFICIENT EVIDENCE OF A CONSPIRACY CHARGE FOR A JURY TO CONVICT, WHICH UNDER THE CIRCUMSTANCES REQUIRES A NEW TRIAL ON THE OTHER CHARGES?

V.     WAS THERE INSUFFICIENT EVIDENCE TO CONVICT THE DEFENDANT OF POSSESSION OF THE COCAINE AT 5969 CADILLAC?

VI.    SHOULD THE DEFENDANT'S CONVICTION FOR RESISTING AND OBSTRUCTING A POLICE OFFICER BE REVERSED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO JUSTIFY THE VERDICT?

VII.   SHOULD THE DEFENDANT'S CONVICTIONS BE REVERSED BECAUSE IT IS AGAINST THE GREAT WEIGHT OF THE EVIDENCE?

VIII.   DID THE COURT COMMIT REVERSIBLE ERROR ON A NUMBER OF RULINGS?  AND, IF THE MISTRIAL MOTIONS WAS CONSIDERED WITHDRAWN BY DEFENSE COUNSEL, SHOULD THAT ACTION BE CONSIDERED INEFFECTIVE ASSISTANCE OF COUNSEL?

IX.   DID THE JUDGE ERR BY DENYING THE DEFENDANT'S MOTION FOR A NEW TRIAL?

X.   IF THE COURT DOESN'T CONSIDER ANY OF THE QUESTIONS PRESENTED BECAUSE OF A LACK OF OBJECTION BY TRIAL COUNSEL, IS THE DEFENDANT ENTITLED TO A NEW TRIAL BECAUSE OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL?

(See Def.-Appellant's Br. on Appeal, docket #38.)  By unpublished opinion issued on January 20, 2004, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (See 1/20/04 Mich. Ct. App. Opinion ("MCOA Op."), docket #38.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner listed the same ten claims raised before and rejected by the Michigan Court of Appeals.  By order entered July 29, 2004, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (See 7/29/04 Mich. Ord., docket #39.)

**<u>Standard of Review</u>**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001), *cert. denied, Texas v. Penry*, 126 S. Ct. 2862 (June 12, 2006). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of

habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be  instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal

principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*,

340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review

for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*,

160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is

presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and

convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.

This presumption of correctness is accorded to findings of state appellate courts, as well as the trial

court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir.

1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to

relief.

### Discussion

I.      Confrontation Clause – Admission of Hearsay

In his first ground for habeas relief, Petitioner argues that his rights under the

Confrontation Clause were violated by the admission of hearsay statements made by the confidential

informant and Tamika Burnett as to the identity of "Puff."  Petitioner raised the claim in the

Michigan Court of Appeals both as a state-law evidence claim and a federal Confrontation Clause

claim.  The Court of Appeals, however, reviewed only the state-law evidence claim.  The court also

held that Petitioner had failed to raise a timely objection to the introduction of evidence and it

therefore reviewed only for plain error affecting Petitioner's substantial rights.

On plain error review, the court of appeals concluded that no hearsay about identity

had been admitted from the confidential informant.  The court held, however, that the statement by

Tamika Burnett to Grammatico (Tr. V, 208) was clearly hearsay and inadmissible. Nevertheless, the

court concluded that admission of the hearsay did not constitute plain error because it was harmless

in light of Petitioner's own admission that the cocaine belonged to him.  The court found that no hearsay about Puff's identity had been admitted because the trial judge had sustained Petitioner's objection to testimony about the confidential informant calling "Puff."  (1/20/04 MCOA Op. at 2-3, docket #38.)

Respondent contends that Petitioner's first habeas ground is procedurally defaulted because the court of appeals found that Petitioner had waived his claim regarding Burnett's identification of Puff by failing to make a contemporaneous objection.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004), *cert. denied*, 544 U.S. 928 (2005); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 126 S. Ct. 2064, 2076 (2006)*; Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-

52.   The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 126 S. Ct. at 2076-77. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default.  *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).  The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.  It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial.  *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271 (1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy."  *Lee*, 534 U.S. at 385.

Upon review, however, I conclude that Petitioner did not procedurally default his Confrontation Clause claim.  Although the Michigan Court of Appeals found that Petitioner had failed to lodge a contemporaneous objection, that conclusion is at clear odds with the factual record.  Admittedly, Petitioner's objection at the time of the testimony was the subject of an unrecorded side-bar.  However, as I previously discussed, Petitioner filed and argued a motion in limine at the beginning of the trial, in which he strenuously objected to the admission of hearsay evidence from the confidential informant and Tamika Burnett concerning the identity of Puff.  (Tr. I, 3-9.)  The trial court ruled that Burnett's identification of Petitioner as Puff would be admitted.  (Tr. I, 9.)  Michigan evidence law unequivocally provides that, once the trial court "makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection

- 38 -

or offer proof to preserve a claim of error for appeal." MICH. R. EVID. 103(a)(2). As a result, Petitioner did not violate the contemporaneous objection rule.

Because the Michigan Court of Appeals did not reach the Confrontation Clause issue and based its decision only on the Michigan evidence rules, the question of whether the issue rose to the level of a constitutional violation is reviewed *de novo*. *McKenzie*, 326 F.3d at 727; *Wiggins v. Smith*, 539 U.S. at 534. The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. CONST., Am. VI. The Supreme Court has long read this right as securing an adequate opportunity to cross-examine adverse witnesses. *United States v. Owens*, 484 U.S. 554, 557 (1988) (citing *Mattox v. United States*, 156 U.S. 237, 242-43 (1895) and *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)); *Delaware v. Van Ardsdall*, 475 U.S. 673, 679 (1986). In 2004, in *Crawford v. Washington*, 541 U.S. 36 (2004) (abrogating *Ohio v. Roberts*, 448 U.S. 56 (1980)), the Supreme Court held that testimonial out-of-court statements by witnesses are barred under the Confrontation Clause, unless (1) the witnesses are unavailable, and (2) the defendant had a prior opportunity to cross-examine those witnesses, regardless of whether such statements are deemed reliable.[4]

In the instant case, applying its own hearsay rules, the Michigan Court of Appeals concluded that Tamika Burnett was unavailable to testify because she had invoked her own Fifth Amendment rights. However, no question exists that Petitioner had no prior opportunity to cross-examine Ms. Burnett. In addition, the identification undoubtedly was testimonial. As a result, under

---

[4]The Sixth Circuit has held that *Crawford* is not retroactive to cases that were final before the case was decided. *See Dorchy v. Jones*, 398 F.3d 783 (6th Cir. 2005). The Supreme Court issued its decision in *Crawford* on March 8, 2004. The Michigan Supreme Court did not deny leave to appeal Petitioner's conviction until July 29, 2004, and his decision was not final until the expiration of the 90-day period in which he could have sought a writ of certiorari in the Supreme Court. As a consequence, Petitioner's conviction was not final until after *Crawford* was decided. *Crawford* therefore is applicable to the instant case.

*Crawford*, admission of Burnett's identification of Petitioner as "Puff" unquestionably violated Petitioner's rights under the Confrontation Clause.

"Unconstitutional limitations on cross-examination are normally subject to harmless-error analysis." *Hargrave v. McKee*, ___ F.3d ___, 2007 WL 2818339, at *9 (6th Cir. Sept. 27, 2007) (citing *Van Arsdall*, 475 U.S. at 681-84). On habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). That standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. In determining whether the restriction was harmless, a court must consider a number of factors, "'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Hargrave*, 2007 WL 2818339, at *9 (quoting *Van Arsdall*, 475 U.S. at 684).

In the instant case, although the Michigan Court of Appeals did not consider the Confrontation Clause issue, it nevertheless addressed whether admission of Burnett's identification evidence constituted harmless error. The court concluded that, in light of Petitioner's own admission that the cocaine belonged to him, Burnett's identification of Petitioner as Puff was harmless.

In *Fry v. Pliler*, 127 S. Ct. 2321 (2007), the Supreme Court held that a federal habeas court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*], 507 U.S. 619 . . . [(1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*[*v.*

*California*, 386 U.S. 18, 21-22 (1967)] . . . ."  127 S. Ct. at 2328.  The Sixth Circuit has determined

that the *Fry* decision overruled *Eddleman v. McKee*, 471 F.3d 576, 583 (6th Cir. 2006), in which the

Sixth Circuit had held that the "AEDPA replaced the Brecht standard with the standard of *Chapman*

plus AEDPA deference when, as here, a state court made a harmless-error determination." *Vasquez*

*v. Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007).  As a result, "[t]o resolve the harmless error issue,

we now must ask whether the constitutional violation 'had substantial and injurious effect or

influence in determining the jury's verdict.'" *Vasquez*, 496 F.3d at 575 (quoting *Brecht*, 507 U.S.

at 623) (internal quotations omitted)).  If the court finds that "the matter is so evenly balanced" that

it has "grave doubt" as to the harmlessness of the error, the court must "treat the error, not as if it

were harmless, but as if it affected the verdict . . ." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995),

*quoted in Vasquez*, 496 F.3d at 575, and *Stapleton v. Wolfe*, 288 F.3d 863, 867 (6th Cir. 2002).

        The Michigan Court of Appeals did not expressly discuss which harmless error

standard it applied in reaching its determination that the hearsay admission of Burnett's statement

that Petitioner was "Puff."  However, as the court of appeals noted, in Michigan, the applicable

standard of review applied to unpreserved error is review for plain error affecting a substantial right

of the defendant.  *See People v. Nyx*, 734 N.W.2d 548, 570 (Mich. 2007).  To demonstrate

harmlessness under the plain error standard, a defendant must show that "'the plain, forfeited error

resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the

fairness, integrity or public reputation of judicial proceedings . . . .'" *Nyx*, 734 N.W.2d at 570

(quoting *People v. Pipes*, 715 N.W.2d 290 (Mich. 2006)); *see also People v. Carines*, 597 N.W.2d

130 (Mich. 1999).  Inasmuch as the court of appeals considered only the purportedly unpreserved

nonconstitutional evidentiary issue, the Court must assume that it applied the harmlessness standard

discussed in *Nyx*, not the *Brecht* standard.  This Court, therefore, must apply the *Brecht* standard on *de novo* review.

The Sixth Circuit routinely applies the *Van Arsdall* factors in determining whether a Confrontation Clause error was harmless under *Brecht*.  *See, e.g., Vasquez*, 496 F.3d at 575-76; *Stallings v. Bobby*, 464 F.3d 576, 582 (6th Cir. 2006); *Fulcher v. Motley*, 444 F.3d 791, 809-10 (6th Cir. 2006); *Madrigal v. Bagley*, 413 F.3d 548, 551-52 (6th Cir. 2005); *Stapleton*, 288 F.3d at 867-68.  Applying those same factors, I conclude that admission of Burnett's brief statement identifying Petitioner as Puff must be considered harmless.

Petitioner's possession of the cocaine was supported and corroborated by several sources.  Upon being arrested, Petitioner was found in possession of a cell phone, the number of which matched the telephone number dialed by Sims before he handed the phone to the confidential informant to arrange a controlled buy.  Petitioner was connected to ownership of the cell phone not only through his possession, but also by way of a receipt for locksmithing services located in the vehicle.  In addition, Petitioner was in possession of a key to 5969 Cadillac, where the cocaine was found.  Further, Petitioner's tan Cadillac was parked outside the 5969 Cadillac address during various drive-bys of that address and during two controlled buys observed by Sims.  At the time of his arrest, Petitioner had on his person nine pieces of U.S. currency of various denominations that matched the pre-recorded serial numbers of bills given to the confidential informant by Hagerman and Weaver for the undercover cocaine purchase.  Finally, Petitioner himself gave a statement to Lieutenants Horton and Taylor on January 18, 2001, in which he admitted that the cocaine inside 5969 Cadillac was his.  He provided the officers with details of his cocaine trafficking, indicating his sources, the amounts of his regular purchases and the prices he paid for the cocaine.  In light of the evidence supporting Petitioner's possession of cocaine, I conclude that the constitutional

violation did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Vasquez*, 496 F.3d at 575 (quoting *Brecht*, 507 U.S. at 623).

Arguably, the identification of Petitioner as "Puff" would have been significant and prejudicial to the charge of conspiracy.  The evidence of conspiracy was thin, and Petitioner's identification as the target of the extensive investigation could have been of substantial importance.  The jury, however, acquitted Petitioner of the conspiracy charge.  Any error, therefore, was harmless.  Finally, the evidence was completely irrelevant to the resisting and obstructing charge.  The constitutional violation therefore could not have had a substantial or injurious effect on the jury's result.

> II.   <u>Consecutive Sentences</u>

Petitioner argues that the trial court improperly imposed his three terms of imprisonment consecutively rather than concurrently.  To the extent Petitioner claims that the consecutive terms violated MICH. COMP. LAWS § 333.7401(3), his claim is not cognizable on habeas review.  The court may entertain an application for habeas relief on behalf of a person in custody pursuant to the judgment of a State court in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES).  The federal courts have no power to intervene on the basis of a perceived error of state law.  *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

To the extent Petitioner asserts a claim that his consecutive sentences amount to cruel and unusual punishment under the Eighth Amendment, Petitioner's claim fails for multiple reasons.  First, Petitioner failed to "fairly present" his federal claim in the state courts.  In his briefs before

the Michigan appellate courts, Petitioner did not raise the Eighth Amendment.  Instead, he claimed

that his sentences violated state law.  Because Petitioner failed to present his Eighth Amendment

claim before the Michigan appellate courts, the exhaustion requirement is not satisfied.

Nevertheless, the Court may address Petitioner's meritless Eighth Amendment claim

notwithstanding his failure to exhaust his state court remedies.  28 U.S.C. § 2254(b)(2).

The United States Constitution does not require strict proportionality between a crime

and its punishment.  *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991); *United States v. Marks*, 209

F.3d 577, 583 (6th Cir. 2000). "Consequently, only an extreme disparity between crime and sentence

offends the Eighth Amendment."  *Marks*, 209 F.3d at 583.  A sentence that falls within the

maximum penalty authorized by statute "generally does not constitute 'cruel and unusual

punishment.'"  *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (quoting *United States v.

Organek*, 65 F.3d 60, 62 (6th Cir. 1995)).  Furthermore, "[f]ederal courts will not engage in a

proportionality analysis except in cases where the penalty imposed is death or life in prison without

possibility of parole."  *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995).  Petitioner was

not sentenced to death or life in prison without the possibility of parole.  Therefore, Petitioner's

sentence does not run afoul of the Eighth Amendment's ban on cruel and unusual punishment.

III.    <u>Prosecutorial Misconduct</u>

Petitioner argues that the prosecutor engaged in a variety of misconduct that denied

Petitioner his right to due process and a fair trial.  Specifically, Petitioner asserts that the prosecutor

improperly introduced a variety of evidence: testimony about the dangerousness of undercover

police work (Tr. II, 10); descriptions of police officers (Tr. II, 11); descriptions of the conspiracy

by "Puff"; arguments concerning the different addresses used by Petitioner and the difference of

names on his Michigan Identification Card; accusations that the defense attorney attempted to

- 44 -

confuse the jury (Tr. XI, 68-69, 71, 76, 85); discussions of exhibits the judge had ordered withdrawn (Tr. XI, 69-70, 102); descriptions of COMET (Tr. II, 37); introduction of hearsay testimony about Puff (Tr. II, 38-40, 68; Tr. III, 80-81; Tr. IV, 47; Tr. V, 208; Tr. VII, 104, 106, 116-17, 119); stressing the number of officers used to execute the search warrant (Tr. II, 86, 99); disclosing the belief of the officers that the person in the Cadillac sold cocaine based on the confidential informant's statement (Tr. II, 87-88); disclosing that they called Puff for ½ kilogram of cocaine in order to ensure Defendant's presence at the house (Tr. II, 89); discussing telephone calls to Puff (Tr. II, 89-96); bringing out the name Isadore Hall as the real name of Robert Charles Hall based on the existence of fingerprints in the fingerprint identification system (Tr. V, 178.)

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and  whether a curative instruction was given by the court. *See id.* at 12-13 (1985);  *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

The Sixth Circuit utilizes a "two-step process for determining whether a prosecutor's alleged misconduct violated a defendant's due process rights, looking first at whether the remarks were improper and then determining whether or not the impropriety was harmless." *Hanna v. Price*, No. 06-1019, 2007 WL 2426445, at *5 (6th Cir. 2007) (citing *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). The latter question is resolved under a four-factor test: (1) whether the conduct tended to mislead the jury or prejudice the defendant; (2) whether the conduct was isolated or extensive; (3) whether the conduct was deliberate or accidental; and (4) whether the evidence against the defendant was strong. *See United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994) (citing *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976), *abrogated on other grounds, as recognized in United States v. Ellerbee*, 73 F.3d 105 (6th Cir. 1996)). Moreover, "[i]n assessing whether the error amounts to a constitutional deprivation, the court must view the totality of the circumstances." *Gall v. Parker*, 231 F.3d 265, 311 (6th Cir. 2000), *superceded by statute on other grounds, as recognized in Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003).

The Michigan Court of Appeals first noted that most of the prosecutorial misconduct alleged by Petitioner was not the subject of contemporaneous objection. It therefore reviewed Petitioner's claims under the plain-error standard.[5] The court reviewed three main types of alleged

---

[5]The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. As previously discussed, the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g., Kelly*, 423 Mich. at 271. Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437. Accordingly, review by this court is barred unless Petitioner can show cause and prejudice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1999); *Murray*, 477 U.S. at 485. In this circuit, "plain error review does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *Atkins v. Phillips*, No. 00-1150, 2000 WL 1720719 (6th Cir. Nov. 8, 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir.1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice"). Petitioner argues as cause excusing his default that counsel was ineffective in failing to object. Where the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default

- 46 -

prosecutorial misconduct: miscellaneous remarks during opening and closing arguments that allegedly involved the injection of irrelevant or prejudicial evidence; introduction of evidence of other bad acts; and comments denigrating the defense.  The court of appeals found that, under the plain error standard, Petitioner had failed to demonstrate any conduct or comments by the prosecutor that rose to the level of prosecutorial misconduct.

A number of matters Petitioner lists as prosecutorial misconduct invoke the same introduction of hearsay testimony in violation of the Confrontation Clause already addressed and rejected in my discussion of Petitioner's first ground for habeas relief.  I have carefully considered each of the remaining allegations of misconduct and find no due process violation.

Many of the cited incidents (such as the description of COMET, the number of officers at the scene of the search warrant and the nature of undercover work) provided context for the testimony of the officers and were not prejudicial.  Other instances involve evidence relevant to Petitioner's behavior, such as his use of an alias, his use of multiple addresses, the fact that telephone calls were made to the cell phone number owned by Petitioner, and the fact that ½ kilo had been ordered through that telephone number in order to ensure Petitioner's presence at the searched address.  I find no error in the prosecutor's efforts to elicit such clearly admissible evidence.

Petitioner also raises a number of remarks made by the prosecutor during closing argument and rebuttal.  First, he contends that the prosecutor impermissibly discussed during rebuttal certain exhibits that had been withdrawn by the court.  (Tr. XI, 69-70.)  I have reviewed the prosecutor's statements and find them to be wholly appropriate.  The prosecutor expressly informed

---

or that Petitioner could show cause and prejudice for that default.  *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

the jury that it would be given an instruction to disregard the handwritten list of serial numbers of the marked bills, which had been annotated to reflect those serial numbers corresponding to bills found on Petitioner's person at the time of his arrest.  The prosecutor nevertheless argued that the jury was not required to disregard the testimonial evidence that Petitioner was found in possession of certain marked currency.  The prosecutor's references were used to clarify for the jury what evidence it could and could not consider respecting Petitioner's possession of marked money.  The distinction made by the prosecutor was both reasonable and necessary to distinguish which evidence the jury could consider. [6]

Second, Petitioner objects to portions of the prosecutor's rebuttal argument during which the prosecutor suggested that defense counsel had attempted to confuse the jury during closing argument because a confused jury would have more difficulty making a decision.  (Tr. XI, 67-69.)  As the Michigan Court of Appeals noted, a prosecutor is free to argue from the evidence that certain defense witnesses are lying, but may not denigrate the defense or defense counsel.  *See Hanna v. Price*, No. 06-1019, 2007 WL 2426445, at *5 (6th Cir. Aug. 27, 2007); *Bates v. Bell*, 457 F.3d 501, 525 (6th Cir. 2006).  The court of appeals concluded that the prosecutor's remarks about confusion were mere characterizations of a perceived defense tactic that did not cross the line into prosecutorial misconduct.  (MCOA Op. at 7-8, docket #38.)

The conclusion by the court of appeals that the prosecutor's remarks did not improperly denigrate defense counsel is not wholly supported by the record.  The prosecutor did not strictly limit his comments to an evaluation of the confusion created by defense counsel's argument,

---

[6]Petitioner also references p. 102 of Volume XI of the trial transcript as an example of the prosecutor's allegedly inappropriate reference to the excluded exhibits.  The page cited by Petitioner reflects a portion of the trial court's instructions concerning those exhibits, not a portion of the argument made by the prosecutor.  The fact that the instruction closely tracks the argument made by the prosecutor further supports the conclusion that the prosecutor's remarks were entirely appropriate.

but instead argued that defense counsel specifically intended to confuse the jury with knowledge that confusion would make it harder for the jury to decide the evidence.

Nevertheless, the prosecutor's remarks, even if improper, were harmless. The inappropriate portions of the comments were not pervasive. The prosecutor's argument was not inflammatory and predominantly focused only on reasoned argument from the evidence presented. As a result, I conclude that any inappropriate arguments had no "'substantial and injurious effect or influence in determining the jury's verdict.'" *Vasquez*, 496 F.3d at 575 (quoting *Brecht*, 507 U.S. at 623).

IV.     Sufficiency of Evidence – Conspiracy

Petitioner next asserts that insufficient evidence was presented to the jury to support a conviction for conspiracy. Petitioner argues at length that the state failed to introduce evidence of the necessary knowledge or agreement to demonstrate the conspiracy.

A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-402 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Even assuming that Petitioner is correct that insufficient evidence supported the conspiracy charge, Petitioner's claim does not constitute a basis for habeas relief. Petitioner was acquitted on the conspiracy charge. As a consequence, the question of evidentiary sufficiency is moot.

Petitioner argues, however, that the lack of evidence on the conspiracy claim requires retrial on the remaining charges. Petitioner cites no authority for the proposition. The Michigan Court of Appeals held that, under Michigan law, when a jury acquits a defendant on an unwarranted charge and convicts on a lesser warranted charge, the erroneous submission of the unwarranted charge to the jury cannot be presumed to have affected the jury's consideration of the warranted charge. *See People v. Hall*, No. 240341, slip op. at 4 (Mich. Ct. App. Jan. 20, 2004) (citing *People v. Graves*, 581 N.W.2d 229, 234-35 (Mich. 1998)). Moreover, the Supreme Court has addressed and rejected a related claim. In *Schaffer v. United States*, 362 U.S. 511, 515-16 (1960), the Court held that, where the trial court has found insufficient evidence to support a conspiracy charge, retrial of co-defendants is not mandatory on the underlying substantive counts. *Id*. The state-court determination is neither contrary to nor an unreasonable application of Supreme Court precedent.

## V.     Sufficiency of Evidence – Possession of Cocaine

Petitioner next argues that the evidence before the jury was insufficient to support the jury's conviction for possession of cocaine at 5969 Cadillac. The Michigan Court of Appeals rejected the argument, holding that Petitioner's possession of the key to the house coupled with Petitioner's own statement, when considered in the light most favorable to the prosecution, were sufficient to support his conviction for possession. The state-court decision reasonably applied the standard set forth by the Supreme Court in *Jackson*, 443 U.S. at 319. I therefore recommend that Petitioner's fifth habeas ground therefore be rejected.

VI.   Sufficiency of Evidence – Resisting and Obstructing

Petitioner next argues that his conviction for resisting and obstructing police officers was supported by constitutionally insufficient evidence.  Petitioner argues that, under MICH. COMP. LAWS § 750.497, an accused may only be convicted of resisting or obstructing an officer in the course of the exercise of his lawful duties.  Because the arrest was not lawful, Petitioner contends, his conviction for resisting and obstructing is improper.

As the Michigan Court of Appeals recognized, Michigan law permits an individual to use reasonable force to prevent or resist an illegal arrest.  (MCOA Op. at 4.)  The court of appeals held that, under MICH. COMP. LAWS § 764.19, because the officers had no warrant to arrest Petitioner, they were required to inform Petitioner of their "authority and the cause of the arrest, except when the person arrested is engaged in the commission of a criminal offense, or if he flees or if he forcibly resists arrest before the officer has time to inform him."  (MCOA Op. at 5.)  The court rejected Petitioner's assertion that officers failed to inform him why he was under arrest and failed to identify themselves as officers.  First, the court held that, although the officers were not wearing full uniforms, the arresting officer was wearing overalls, a raid vest and a hat, all of which said, "Police," and a marked police vehicle was in the area at the time of the arrest.  In addition, the court found that the record indicated that Officer Horton had begun the confrontation by announcing that he and his colleagues were the police, whereupon Petitioner attempted to flee.  The evidence also demonstrated that officers repeatedly told Petitioner to "get down" and that he was under arrest. The court held that a reasonable trier of fact could conclude from the evidence that Petitioner's resistance was in progress while the officers moved to arrest him, thereby relieving them of the duty to explain why he was under arrest.

The Michigan Court of Appeals reasonably applied the *Jackson* standard to conclude that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Accordingly, I recommend that Petitioner's sixth ground for habeas relief be denied.

VII.   Great Weight of the Evidence

In his seventh ground for habeas relief, Petitioner argues that the jury's verdict was against the great weight of the evidence. As a result, Petitioner asserts, the trial court abused its discretion to grant a new trial.

A federal court on habeas review has no authority to grant habeas relief on the grounds that the verdict is against the great weight of the evidence. *See Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir. 1985). The Constitution is concerned solely with whether the evidence at trial is sufficient to support the verdict under *Jackson*, 443 U.S. at 319. The decision to grant a new trial on the grounds that the verdict is against the great weight of the evidence is strictly a state-law claim.

This Court may entertain an application for habeas relief on behalf of a person in custody pursuant to the judgment of a State court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A habeas petition must "state facts that point to a 'real possibility of constitutional error." *Blackledge*, 431 U.S. at 75 n.7 (1977) (internal quotation omitted). A federal habeas court has no power to intervene on the basis of a perceived error of state law. *Pulley*, 465 U.S. at 41.

Because it seeks relief on a state-law claim, Petitioner's seventh ground for habeas relief is not cognizable on habeas review.

- 52 -

VIII.   Miscellaneous Rulings in Violation of Due Process

In his eighth ground for habeas relief, Petitioner contends that the state court committed "reversible" error on a number of rulings.  First, he asserts that the trial court violated his right to due process in determining that venue for the trial was proper in Macomb County.  Second, he contends that the court's denial of his motion for mistrial violated his rights of confrontation and due process.  Third, he argues that the denial of his motion to suppress evidence of his statement violated both state and federal law.

A.      Venue

The Michigan Court of Appeals considered Petitioner's claim as follows:

Defendant further argues that the trial court improperly determined that venue was proper in Macomb County.  We disagree.  "Due process requires that trial of criminal prosecutions should be by a jury of the county or city where the offense was committed, except as otherwise provided by the Legislature."  While venue is not an element of a crime, it [is] a necessary part of the prosecutor's case.  A trial court's decision with regard to venue in a criminal proceeding is subject to review de novo.

It is undisputed that defendant was arrested outside of Macomb County.  It is also undisputed that the majority of seized cocaine was found outside of Macomb County.  However, "[w]henever a felony consists or is the culmination of 2 or more acts done in the perpetration thereof, said felony may be prosecuted in any county in which any one of said acts was committed."  In this case, there was evidence that a police informant assisted two individuals in purchasing a large amount of cocaine from the Cadillac residence.  The police understood these individuals to be drug traffickers operating in Macomb County.  After the individuals obtained the cocaine, the police followed them into Macomb County.  It was at this point that the police apprehended one of the individuals attempting to flee from a vehicle.  The police discovered a bag or cocaine nearby.

"[T]he place of commission of an act is not limited to the place of the defendant's physical presence.  An act that has effects elsewhere that are essential to the offense is, in effect, committed in the place where the act has its effects."  Although the two customers completed the cocaine transaction in Detroit, they drove cocaine into Macomb County.  We consider this to be a sufficient connection with defendant's drug trafficking activities.  Thus, venue was proper in Macomb Count[]y.

(MCOA Op. at 7-8 (footnote citations omitted).)

Notwithstanding the court of appeals' characterization of the claim as a due process interest, it is such an interest under state law.  No United States Supreme Court precedent requires that a state court prosecute any crime in a particular county.  The Sixth Circuit has recognized that venue in federal cases is not a jurisdictional prerequisite, but a privilege granted to the accused.  *See United States v. Williams*, 274 F.3d 1079, 1083 (6th Cir. 2001 (citing *Williams v. United States*, 582 F.2d 1039, 1041 (6th Cir. 1978)).  Here, the Michigan Court of Appeals determined that, in light of the transport of some of the cocaine sold at 5969 Cadillac to a location in Macomb County, venue was proper in Macomb County as well as Wayne County.  That determination was based on a construction of state law, which is not reviewable by this Court in a habeas proceeding.  *See Pulley*, 465 U.S. at 41.

B.       Denial of Mistrial

Petitioner contends that the trial court erred in failing to grant his motion for mistrial. At the close of proofs, defense counsel raised concerns about the trial court's admonitions of defense counsel and about the demeanor of the jury.  Counsel noted that jurors had been laughing and whispering among themselves and were giving less than full attention to the trial proceedings.  The trial court initially expressed its intention to grant the motion.  However, after questioning each juror separately, the court concluded that jurors had not reached premature conclusions and that the jury remained impartial and attentive.  The court therefore denied the motion.

The court of appeals reviewed the record and found that the trial court correctly concluded that the jurors were prepared to render a fair judgment.  Indeed, defense counsel himself

conceded that the jurors appeared unbiased.[7]  The court found that Petitioner had failed to identify any statements revealing frustration by jurors that was prejudicial to Petitioner.  It therefore concluded that the minimal irregularities concerning the jurors did not prejudice Petitioner or impair his ability to obtain a fair trial.  (MCOA Op. at 9.)

The Due Process Clause of the Untied States Constitution states that a criminal defendant has a right to a fair trial before a fair and impartial jury.  The right to due process, however, does not require a new trial in every instance in which a juror potentially is biased.  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  Instead, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.* (citing *Remmer v. United States*, 347 U.S. 227 (1954)).  When conducting habeas review of a trial decision of a state court to deny a defendant's motion for mistrial, a federal court will not grant relief unless the trial error was so prejudicial as to deprive the defendant of a constitutionally fair trial.  *Zuern v. Tate*, 336 F.3d 478, 485-86 (6th Cir. 2003).  The *Zuern* court held that, when a habeas court addresses a claim of juror misconduct, it must consider four points: (1) whether the state court held a hearing; (2) that no presumption of prejudice arises from any improper contact; (3) that the petitioner bears the burden of proving actual bias; and (4) that juror testimony at a hearing is not inherently suspect.  *Id.* at 486 (citing *United States v. Rugiero*, 20 F.3d 1387, 1390 (6th Cir. 1994)).

Here, the trial court held a hearing.  The court asked each juror about his or her attitudes, attentiveness and ability to be fair.  Upon careful review of the jurors' responses to the court's questions, I conclude that the trial court's determination that the jury was fair and impartial

---

[7]The court of appeals did not rely on defense counsel's arguable abandonment of his request for a mistrial. Instead, the court considered the claim on its merits.  Accordingly, the claim was not procedurally defaulted.

to be well supported.  The Michigan Court of Appeals' decision on appeal was a reasonable application of Supreme Court precedent.  Accordingly, I recommend Petitioner's claim be denied.

C.      Denial of Motion to Suppress

Petitioner argues that the trial court erred in denying the motion to suppress Petitioner's statements to Detective Lieutenants Taylor and Horton.  Petitioner contends that his statements were involuntary because the officers threatened him by mentioning that he faced a penalty of life imprisonment.

The trial judge held a suppression hearing on the admissibility of the statements, during which she found that Petitioner had made a knowing and intelligent waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  On review, the court of appeals concluded that, while involuntary statements were not admissible, the voluntariness of the statement is "'determined solely by examining police conduct.'"  (MCOA Op. at 3 (quoting *People v. Abraham*, 599 N.W.2d 736 (Mich. Ct. App. 1999)).  The court of appeals found that the statement made by the officers was not a threat, but was a statement of fact based on Petitioner's prior drug conviction.

Petitioner contends that his waiver of his rights was not voluntary.  A defendant may waive his rights under *Miranda* "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. at 444.  To determine whether a waiver was proper, a court must consider two inquiries.  First, the waiver must have been voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Second, the waiver must have been made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*  The waiver is proper if, under the totality of the circumstances, the choice was uncoerced and made with the requisite level of comprehension. *Id.*

- 56 -

The Supreme Court has held that the standard for the voluntariness of a *Miranda* waiver parallels that for a Fourteenth Amendment voluntariness determination. *See Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986) ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context.").[8] A court must examine the totality of the circumstances to determine whether a proper waiver has occurred. *See Moran*, 475 U.S. at 421; *Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004); *Seymour v. Walker*, 224 F.3d 542, 553-54 (6th Cir. 2000). In conducting this test, a court should consider factors such as:

> (1) police coercion; (2) length of interrogation; (3) location of interrogation; (4) continuity of interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of *Miranda* rights.

*Abela*, 380 F.3d at 928 (citing *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993)). Of these factors, "[c]oercive police activity is a necessary element for finding that the waiver of *Miranda* rights was involuntary." *Id.* (citing *Connelly*, 479 U.S. at 167). The government bears the burden of proving by a preponderance of the evidence that a petitioner has waived his rights. *Abela*, 380 F.3d at 928; *Connelly*, 479 U.S. at 168. The question of voluntariness is a mixed question of fact and law. *Miller v. Fenton*, 474 U.S. 104, 112 (1985) (citing *Davis v. North Carolina*, 384 U.S. 737 (1966)). On habeas review, a court must apply the "unreasonable application" prong of § 2254(d)(1) to mixed questions of fact and law. *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003)*; Hunt v. Mitchell*, 261 F.3d 575, 580 (6th Cir. 2001).

---

[8]Similarly, the Supreme Court has indicated that the standard for voluntariness in the waiver of *Miranda* rights under the Fifth Amendment is the same as that for the waiver of the trial right to counsel under the Sixth Amendment; both standards require knowledge of the rights being given up any specific evidence of the waiver. *See Miranda*, 384 U.S. at 476-78 (relying on *Johnson v. Zerbst*, 304 U.S. 458 (1938) (Sixth Amendment voluntariness inquiry), and *Carnley v. Cochran*, 369 U.S. 506 (1962) (same)).

Here, as the Michigan Court of Appeals concluded, Petitioner has failed to demonstrate any police misconduct that would render his confession coerced. The mere fact that officers informed Petitioner of the potential sentence he faced was not coercive action. The representations made by the officers were simply factual and were not in any way misrepresentations that could amount to police misconduct. As a consequence, the determination by the Michigan Court of Appeals constituted a reasonable application of Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1).

IX.     Denial of Motion for New Trial

Petitioner asserts that the trial court abused its discretion by denying his motion for new trial. He asserts that the court committed numerous errors, depriving Petitioner of a fair trial. He therefore contends that the denial of a new trial was unreasonable in light of the evidence presented in the state court proceedings.

As previously discussed with respect to Petitioner's seventh ground for habeas relief, this Court has no authority to grant habeas relief on the grounds that the verdict is against the great weight of the evidence, the standard for granting a new trial. *See Young*, 760 F.2d at 1105. A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge*, 431 U.S. at 75 n.7; *see also* 28 U.S.C. § 2254(a). Petitioner has presented and I have addressed and rejected each of the alleged constitutional errors in turn. To the extent Petitioner attempts to invoke the standard for grant of a new trial under state law, his claim is not cognizable on habeas review.

Arguably, Petitioner may intend to claim that he is entitled to relief because the alleged constitutional errors, if they do not independently constitute grounds for relief, warrant relief when viewed in the aggregate. Such a claim is not a basis for habeas relief. Although Sixth Circuit precedent supports the proposition that errors that are harmless in isolation may require reversal

when taken together, *see United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000); *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983), no United States Supreme Court precedent recognizes the cumulative error doctrine. Under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law. *Bailey*, 271 F.3d at 655. Both because he has failed to demonstrate any errors to aggregate and because his claim depends on non-Supreme Court precedent, Petitioner is not entitled to habeas corpus relief on this ground. *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004).

X.   Ineffective Assistance of Counsel

In his final ground for relief, Petitioner does not raise an independent claim. Instead, he argues that, to the extent the Court should find that Petitioner failed to make a contemporaneous objection to preserve a separate constitutional claim, his attorney rendered ineffective assistance of counsel. In the course of my discussions of the relevant constitutional claims, I have addressed his claim that the ineffective assistance of counsel should excuse any procedural default. Accordingly, Petitioner's tenth ground for habeas relief has been fully discussed and found to be without merit.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  January 10, 2008                    /s/ Hugh W. Brenneman, Jr.
                                            HUGH W. BRENNEMAN, JR.
                                            United States Magistrate Judge

- 59 -

## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).